Filed 4/29/14  In re B.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re B.B., et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E059934 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J242950, J242951) |
| v. | OPINION |
| A.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Kristina M. Robb, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant A.B. is the father (father) of two children, M.B and B.B (the children), who were ages 13 and 10 years on the date of the order at issue here. Father appeals from the juvenile court's order after a hearing under Welfare and Institutions Code section 366.26.[1] The court terminated father's parental rights to the children and set adoption by their maternal grandparents as the permanent plan. Father argues the court erred when it found the beneficial parental relationship exception to the presumption for adoption did not apply. As discussed below, father did not maintain regular contact and visits with M.B. In addition, father negated the benefit of his relationship with B.B. by allowing mother to have access to B.B. without regard to court orders or B.B.'s feelings of safety. For this reason, we affirm the juvenile court's terminating parental rights and selecting adoption as the children's permanent plan.

### FACTS AND PROCEDURE[2]

Detention

In February of 2012, witnesses called police after they saw the children's mother (mother)[3] kicking, slapping and beating them in a parking lot after she returned to the car from a pizza restaurant. M.B., who was 11 years old at the time, told the responding social worker that she and her 8-year-old brother B.B. waited in the car while their

---

[1] All section references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The facts and procedure of this case through the 12-month review hearing are taken from the opinion in Court of Appeal case number E058813, filed August 19, 2013.

[3] Mother is not a party to this appeal. She is mentioned only where necessary.

mother went to pick up a pizza. B.B. took the keys out of the ignition and they were misplaced. When mother returned she said "Where the f____ are my keys?" Mother kicked M.B. in the stomach twice and kicked B.B. in the groin. She slapped both children in the face and punched B.B. in the head twice. B.B. got a bloody nose and could not see out of his left eye for five minutes. M.B. complained of pain in her stomach. After the keys were found, mother told the children "wait till we get home and inside, you guys will be black and blue. Will not be able to sit, walk or see."

The children told the social worker that both mother and father beat them regularly, and that the parents fought a lot. M.B. stated that father hits her "all over," and that as recently as three months prior father "was pounding me and hitting me over and over and over and over." B.B. said father hit him with a belt, or a shoe or whatever is around. Father was also arrested. The children were detained immediately and placed in foster care.

The San Bernardino County Department of Children and Family Services (CFS) filed a section 300 petition on February 17, 2012. CFS alleged the children had suffered serious physical harm (subd. (a)) from the beatings and serious emotional damage (subd. (c)) from the domestic violence, and that both parents failed to protect the children (subd. (b)) because they had a history of neglect, including a previous dependency case, mother had a history of substance abuse and father failed to protect the children from mother's behavior, and both parents failed to protect the children from physical abuse by the other parent.

At the detention hearing held on February 21, 2012, the court found a prima facie case for detention.

Jurisdiction and Disposition

In the report prepared for the jurisdiction and disposition hearing, CFS recommended the parents not receive reunification services. The social worker reported an interview with M.B. in which M.B. stated her parents had hit her consistently since she was a little girl, and that she did not want to see her parents at that time. M.B. appeared to be very angry. In an interview with B.B., B.B. described several specific instances in which mother severely beat both himself and M.B. "It's scary. We get hit so many times. So we just end up going to our rooms and staying there for five hours." When asked individually where they wanted to live, each child said they wanted to go to Arizona to live with their maternal grandparents.

On May 24, 2012, both parents submitted as to jurisdiction. The juvenile court found true each of the allegations and ordered reunification services for the parents. The children were ordered placed with the maternal great aunt (caregiver).[4] Supervised visits were to be once per week.

---

[4] The social worker reports often refer to the plural "caregivers." This appears to be the maternal great aunt and her husband. Various other maternal family members attended hearings, including mother's uncle, nephew, sister, brother-in-law, and stepfather.

In an updated case plan, dated June 19, 2012, the parents were to participate in domestic violence/anger management and parenting education programs, and in counseling to address the issues that led to the dependency.

Father's Request for Increased Visitation

On August 28, 2012, CFS submitted a packet to the juvenile court reporting on father's positive progress in his case plan and requesting unsupervised visits with father, possibly progressing to overnight visits. Mother was not to be present for other than supervised visits. On September 4, 2012, minors' counsel filed a notice of objection and special hearing on the children's behalf, specifying that the parents continued to threaten the caretaker in open court and that the children were fearful to have unsupervised visits. At the hearing held on September 19, 2012, CFS withdrew the packet and minors' counsel withdrew the objection. Visits were to continue with supervision.

Six-Month Review

In the six-month status review report filed November 19, 2012, CFS recommended the children remain in their placement and that reunification services to the parents continue. The parents were participating in services and had decided to live apart because they could not get along.

Regarding visitation, the children had previously told the social worker that they would be comfortable having unsupervised visits with their father, as long as their mother did not attend. This appears to be why the social worker submitted the packet requesting unsupervised visits in August 2012. The children had changed their minds as of the

5

September 19 hearing on the packet and objection. Between that hearing and the six-month review report, there were no visits. This is because the children and caretaker called the social worker each week to state they did not want visits. In separate conversations, each child told the social worker that they were afraid their parents would not change and they would be hit again. Both children wanted to eventually live with their maternal grandparents in Arizona. The social worker recommended conjoint family counseling to overcome these issues.

The six-month review hearing was held on November 26, 2012. After an in-chambers conference, the children agreed to participate in visitation. The supervised visits were to be once per week at the CFS office from 4:00 to 5:00 p.m. with mother and 5:00 to 6:00 p.m. with father. The caregiver was to transport the children to the visits.

On December 21, 2012, CFS filed an addendum report for the further six-month review hearing on December 31, 2012. The report's purpose was to "update the court on family visitations." The parents each had their separate, back-to-back visits with the children on November 28, and on December 5, 12 and 19. Father's first two visits were generally positive, while mother was quite volatile. B.B. interacted positively with father during these first two visits, while M.B. eventually interacted with father and B.B. after some coaxing by father. During one of the visits, father became angry when M.B. did not want to participate in the visit and when the caregiver "appeared to be laughing." As M.B. and the caregiver were walking down the hallway away from the visitation room, father yelled about how the caregiver was interfering with the reunification process, and

6

raised his middle finger at the caregiver. The visit ended at that point, at about 5:20 p.m., because neither child wanted to continue the visit. The December 19 visit with father went well. Both children interacted positively with father for nearly the entire visit, despite a very negative visit with mother in the previous hour. Toward the end of the visit B.B. appeared to be talking back to father. Father spoke to B.B. calmly about being respectful, but B.B. appeared to find this funny and smiled throughout father's comments. At the end of the report, the social worker commented that the visits were deteriorating and that the children "know how to get a reaction from their parents that are not positive and the parents don't seem to know how to control their tempers." The social worker also stated that the family urgently needed to get into family counseling but the counseling facility did not have a licensed therapist available after school hours.

A further six-month hearing was held on December 31, 2012. Father's counsel and mother's counsel each complained that conjoint counseling had not yet been arranged and that the caregivers were empowering the children to refuse to visit, and to not cooperate during visits. At the conclusion of the hearing, the court ordered CFS to ensure that the family began conjoint counseling no later than January 18, and that the counseling sessions initially be conducted in lieu of visits.

Twelve-Month Review and Father's First JV-180

In the status review report filed April 22, 2013, CFS reported that the family had attended five conjoint counseling sessions, the parents had one session together, the children had one session together, and each of the four had an individual session. During

7

two conjoint sessions in February, the family was laughing with each other and making jokes, but during the remainder of the sessions the family interacted negatively and acted aggressively toward each other. The therapist terminated the family sessions after the conjoint session on March 26, 2013, because she believed family counseling was more detrimental than beneficial. The therapist reported that both parents maintained that the abuse was a "lie." The children in turn viewed the parents negatively because they did not believe their parents could change. The therapist opined that the parents did not recognize there was a problem and that their relationship with the children was damaged before CFS became involved. The last session on March 26 ended early after the parents and children continued to yell at each other and ignore the therapist's instructions.

On April 17, 2013, father filed a form JV-180 Request to Change Court Order. Father challenged the juvenile court's order of December 31, 2012, in which it continued the children in the care of their great aunt. Father asked for a new order placing the children with their paternal grandmother and an order continuing reunification services. Father argued these changes would benefit the children because family reunification was impossible with the current placement.

CFS filed its response to the JV-180 on May 7, 2013, asking the juvenile court to deny the petition. The paternal grandmother, with whom father asked the children to be placed, had died.

On May 17, CFS filed a document entitled "Additional Information to the Court" in which it recommended that both visits and reunification services be terminated as to

8

mother but continued as to father. CFS described additional volatile visits with mother, her refusal to drug test throughout the dependency, and refusal to consent to family counseling with a different provider unless she could choose the provider. CFS concluded that "visits with the mother have become detrimental to the emotional health of their children."

The 12-month review hearing and the hearing on father's section 388 petition was held on May 20, 2013. After hearing argument regarding whether father had established a prima facie case under section 388 to merit a hearing on his petition, the court ruled that father had not established changed circumstances or that a change of placement would be in the children's best interest, so the court denied the petition without a hearing.

At the 12-month review portion of the hearing, Father testified that he had completed all of his services, including anger management and individual counseling, in 2012. The individual counseling was with the therapist who later provided the conjoint family counseling. Father testified that he found it to be a problem for reunification that his children resided with maternal relatives when that side of the family no longer spoke with mother, or with him. Father testified that, during the conjoint therapy sessions, he would attempt to remain quiet and try to just get through the session. Father testified that, after the conjoint counseling was cancelled, he had several visits with just himself and the children, and that they all went well. However, the last two visits also included mother, and they did not go as well. Father testified that he would like to have conjoint therapy with just the children, without mother present, because the sessions that had gone

9

well were the early ones in which he had taken the lead in interacting with the children. Father asked the court to grant him visits with the children outside of therapy. He stated that his relationship with B.B. was better than that with M.B., and that the last time they had discussed visitation, B.B. wanted unsupervised visits with father, but M.B. wanted to first speak with her attorney. Father understood that if he were to get the children back, he would not be able to reunite with mother. Under questioning by the court, father stated he had permanently separated from mother in December 2012. Father testified that, after the children had previously been removed by CFS in 2006, the case was closed and the children were returned to his care in 2007 on the condition that mother have no contact with the children. In about 2008, the parents reunited and mother moved back into the home. Father did not believe mother was a safety risk to the children. Father admitted that he and mother fought a lot, and that he knew mother spanked the children when he was not home, although he disagreed with mother's actions. Father denied hitting the children or using a belt on them.

At the conclusion of the hearing, the juvenile court found that reasonable services had been provided and ordered reunification services terminated as to both parents, but allowed father to have supervised weekly visits pending the section 366.26 hearing set for September 17, 2013. The court reasoned that father had not demonstrated a willingness to place his children's welfare above his relationship with his wife, and had not learned from previous experience that the children were not safe around mother. Father timely

10

filed his Notice of Intent to File Writ Petition, which petition this court denied in an unpublished opinion.

Supplemental Petition and Father's Second JV-180

On June 21, 2013, the juvenile court granted a restraining order against mother in favor of the children, their caregivers and their attorneys. Mother had made verbal threats after court hearings and made numerous postings on social media about her violent plans for revenge over the CFS case.

On June 28, 2013, CFS filed a supplemental juvenile dependency petition under section 387 requesting a change of placement from the home of their caregiver, the maternal aunt, to a "more restrictive level of care." On June 18, 2013, M.B.'s school counselor called the social worker to report that M.B. was unwilling to return to the caregiver's home and did not want to live there anymore because the caregiver was "mean." The social worker told M.B. to go home that night and called the caregiver to ask her to bring the children to the CFS office the following day. On June 19, 2013, the caregiver gave a 7-day notice that she wanted the children removed from her home. She stated that, since the May hearing at which the parent's reunification services were terminated, the children had become defiant, disrespectful and acted like they could do anything they wanted. The children were moved to a new foster home on June 26, 2013.

At a hearing on the petition held on July 1, 2013, the juvenile court ordered the children detained and directed CFS to confirm that the maternal grandparents in Arizona

11

had been approved for placement through an ICPC and that they were willing to take the children.

On July 11, 2013, father filed a form JV-180 Request to Change Court Order under section 388. Father challenged the juvenile court's order of May 20, 2013, terminating his reunification services. Father asked for a new order reinstating his reunification services and cited as a changed circumstance the removal of the children from their previous caregiver. Father alleged the maternal grandparents had long interfered with his efforts to reunify with the children by influencing them against him.

At the hearing held on July 23, 2012, the juvenile court authorized CFS to place the children with their grandparents in Arizona so that they could begin school on time on August 5. The court ordered father to have weekly telephone calls with the children and monthly unsupervised day visitation, either in California or Arizona. Father's counsel asked that the hearing on his section 388 petition be continued so he could be present and not miss work. The court granted the request.

On August 6, 2013, the juvenile court held the contested jurisdiction and disposition hearing on the supplemental petition and on father's section 388 petition. The children's counsel emphasized that M.B. wanted to stay in the current placement with her grandparents because she had been in ten different schools and did not wish to move anymore. The court found no change of circumstances, and that it was not in the children's best interest to reinstate reunification services, and so denied father's section 388 petition. The court also took jurisdiction over the children under the supplemental

12

petition and confirmed their placement with the maternal grandparents in Arizona. The court confirmed monthly unsupervised visits with father and set the section 366.26 hearing for October 15, 2013. The court expressed optimism that M.B. would join in the unsupervised visits with father and B.B. as long as mother was not "anywhere in the picture," because both children were afraid of mother. Father replied "Mom's not in the picture."

Section 366.26 Hearing

In the report prepared for the section 366.26 hearing set for October 15, 2013, CFS recommended adoption by the maternal grandparents and termination of mother and father's parental rights. The children had been living with the maternal grandparents in Arizona since July 27. The children had supervised visits with both parents on June 25, July 2, July 9 and July 16. The visits were appropriate. On August 17, B.B. had an all-day unsupervised visit with father that went well, but M.B. refused to participate. An overnight visit was set for September 21. M.B. stated she did not want an overnight visit, but would participate in a day visit. The overnight visit with just B.B. and father took place on September 21. B.B. initially stated that the visit went well. However, he later told his grandparents that father had called mother during the visit and put B.B. on the telephone with mother. On October 9, 2013, the grandparents contacted CFS to report

13

that mother had been present during an overnight visit at father's house.[5] B.B. told the social worker that he felt unsafe in mother's presence.

At the section 366.26 hearing set for October 15, 2013, both children were present. The children's counsel told the court that B.B. did not want to see father. M.B. told the court that she was not participating in visits. Father asked to set the matter for an evidentiary hearing, which the court set for October 28. The court suspended visitation based on the additional information about mother's phone call and presence during the recent unsupervised visits. The court commented, "I have had conversations with these kids, and trust is everything, and Father violated their trust."

The section 366.26 hearing was held on October 28, 2013. Counsel for the children told the court that they were "in favor of being adopted by the grandparents, and are fine with the termination of parental rights." Father testified on his own behalf. Father reiterated his belief that the grandparents were interfering with his relationship with the children. Father testified that the last two unsupervised visits with B.B. had gone really well, and that they had bonded. Father stressed that B.B. had called him after the last visit to confirm that B.B. had arrived home in Arizona safely and was looking forward to the next visit. Father stated he hadn't had any contact with M.B. in the last

---

[5] An "Additional Information to the Court" memo, dated October 10, 2013 and filed October 15, is not clear regarding the date of the visit during which mother was present at father's home. Father's testimony at the section 366.26 hearing on October 28, 2013, indicates this took place during an overnight visit on October 8. Father testified that mother did not come inside his home, but stopped by without his knowledge to drop off a camera, and that B.B. was outside at that time and spoke with mother.

14

few months. Father believed that guardianship would be a more appropriate plan than adoption because it would give him a chance to reunify with B.B. and to work on his relationship with M.B. Regarding the condition that he not allow mother to have any contact with the children during visits, he related, "I had talked to the—my son's mom. She had a camera she was going to let me borrow. She had dropped it off, and my son just noticed his mom, and he asked her to stay and talk to him and visit with her." Father testified that he did not have a good relationship with the maternal grandparents and believed if the children were adopted they would not allow him to see the children.

After hearing argument from the parties, the juvenile court concluded that father and M.B. had not maintained regular visitation. Regarding B.B., the court noted that B.B. had not objected to adoption and stated he in fact wanted to be adopted. This was based on B.B.'s lack of trust in father to keep B.B. safe from mother, despite the efforts of B.B. and father to establish a relationship. The court concluded that the children were likely to be adopted and that the exception for a beneficial parental relationship did not apply in this case. The court terminated father's parental rights and chose adoption with the maternal grandparents as the children's permanent plan.

This appeal followed.

## DISCUSSION

Father argues the juvenile court erred when it determined the exception to the presumption for adoption for a beneficial parental relationship did not exist. Specifically, father argues he had re-established a strong, parent-child relationship with B.B. and that,

15

at the time of the section 366.26 hearing, it appeared they were on the brink of reunification.  Father also argues that he and M.B. had made progress on their relationship and he wanted a "fighting chance" to establish a better relationship.

*Applicable Law*

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)  Permanent plans include adoption, guardianship, and long-term foster care.  (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.)  "Adoption, where possible, is the permanent plan preferred by the Legislature."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)

Adoption involves terminating the legal rights of the child's natural parents, but guardianship and long-term foster care leave parental rights intact.  (*In re Autumn H., supra,* 27 Cal.App.4th at p. 574.)  "Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child."  (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1344.)

To avoid adoption and termination of parental rights at a section 366.26 hearing, a parent has the burden of showing one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply.  (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469; *In re Celine R.* (2003) 31 Cal.4th 45, 53.)  These exceptions "merely permit the court, in *exceptional circumstances* [citation], to

choose an option other than the norm, which remains adoption." (*In re Celine R.,* at p. 53.)

The beneficial parental relationship exception applies when two conditions are shown: the parent has "maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i), italics added; *In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) In order to show that the child would benefit from continuing the relationship with the parent, the parent "must do more than demonstrate . . . an emotional bond with the child"; the parent "must show that he or she occupies a 'parental role' in the child's life." (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)

The parent must also show that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

"'The balancing of competing considerations must be performed on a case-by-case basis and take into account many variables, including the age of the child, the portion of

the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.  [Citation.]  When the benefits from a stable and permanent home provided by adoption outweigh the benefits from a continued parent/child relationship, the court should order adoption.' [Citation.]"  (*In re Jasmine D* (2000) 78 Cal.App.4th 1339, 1349-1350.)  In other words, "[i]f severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]"  (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1235.)

*Standard of Review*

Appellate courts have traditionally applied either the substantial evidence test or the abuse of discretion test in considering challenges to juvenile court determinations that the parental benefit exception did not apply.  (*In re Scott B., supra,* 188 Cal.App.4th at p. 469.)  There is little, if any, practical difference between the two.  (*Ibid.*)

As explained in *In re Jasmine D.*:  "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge.  The reviewing court should interfere only "'if [it] find[s] that . . . no judge could reasonably have made the order that he did.' . . .'"  [Citations.]"  (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.)[6]

_____

[6]  More recently, courts have applied a composite standard of review, recognizing that the parental benefit exception entails both factual and discretionary determinations. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [substantial evidence standard

*[footnote continued on next page]*

18

*Analysis*

Here, father had maintained regular visitation and contact with B.B., but not with M.B. As father testified at the section 366.26 hearing on October 28, 2013, he had not seen M.B. since their last visit on July 16, three and a half months prior. M.B. had refused to visit with father after the children moved to Arizona at the end of July. Previous to that, both M.B. and B.B. had refused to visit with father for several months in the fall of 2012, and their visits in the form of conjoint family therapy in the first few months of 2013 were at first successful, but ultimately ended in disaster.

Father did maintain regular contact and visitation with B.B, with the exception of the fall of 2012. The question is whether the relationship between B.B. and father was more beneficial to B.B. than the stability he would enjoy in an adoptive home. B.B. was relatively young, only ten years old at the time of the section 366.26 hearing. He had lived with father for the first eight years of his life, although B.B. reported being subjected to regular beatings during that time, including by father with a belt, shoe or "whatever was around." B.B. showed obvious affection for his father and looked forward to their visits. However, the grandparents reported that B.B. acted out both before and after visits with father. B.B. had consistently told CFS that he did not want to return to his father's care, stating that he did not believe his parents would change. B.B. told the

applies to factual determination whether a beneficial relationship exists, and abuse of discretion standard applies to discretionary determination whether there is a compelling reason to apply the exception]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [same].) Here, however, the facts are essentially undisputed and the question is whether the court abused its discretion in determining that the parental benefit exception did not apply.

court on October 15, 2013, through the children's counsel, that he did not want to visit with father anymore.

Regarding B.B.'s particular needs, the CFS reports and the children's counsel indicate that his main needs are for stability and safety. For example, M.B., told the children's counsel that the school in Arizona would be the 11th school she had been to and that, no matter what the court's decision regarding the initial move to Arizona, she just wanted to be in one place and not move around. Presumably B.B. had been to a similar number of schools and had a similar desire for stability. In addition, although B.B. had told his counsel that he wanted to attend court sessions, he chose not to attend the session on August 6, 2013, because he did not wish to miss the second day at his new school in Arizona. Finally, father placed in great doubt the beneficial nature of his relationship with B.B. when father continued his longstanding behavior of using his access to the children to allow mother to have contact with them despite court orders to the contrary and despite the fact that the children did not feel safe around mother. Most recently, during B.B.'s September 21, 2013, unsupervised visit with father, father called mother and put B.B. on the telephone so he and mother could speak with one another. Even worse, on the last unsupervised visit on October 8, 2013, father did not intervene when mother personally stopped by his residence and spoke with B.B. As B.B. later told the social worker about this incident, he did not feel safe about his mother being present. Although father testified that he did not know mother would stop by to bring him the

20

camera that they discussed she would lend to him, the juvenile court could certainly have chosen not to believe this version of events.

In sum, although B.B. did at many times enjoy and appear to value his relationship with father, father had a history of putting mother's desire for contact with the children above B.B.'s interest in feeling safe in father's care. When this is balanced against the children's expressed need for stability and a permanent placement in a loving home, we conclude the trial court did not err when it concluded the beneficial parental relationship exception to the presumption for adoption did not apply in this case.

### DISPOSITION

The juvenile court's orders terminating father's parental rights to both children and selecting adoption as the permanent plan are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

KING
J.

CODRINGTON
J.

21